Productions, Inc. and Passport International Productions of California, Inc. And with the Court's permission, I'd like to reserve three minutes for rebuttal. Basically, this is a copyright case masquerading as a trademark and right of publicity case. But because the plaintiff does not own the copyright in the footage that is at issue here, they tried to fashion a claim based on trademark dilution and rights of publicity law. It's our position that the District Court abused its discretion in a number of areas, particularly in finding that they had shown by clear and convincing evidence that there was a likelihood that plaintiffs would succeed on the merits of those claims. And in particular, because the District Court adopted the findings of fact and conclusions of law that were submitted to it by the plaintiff, it is our position that under Comstock this Court should pay special attention and give close scrutiny to the Court's findings of fact and conclusions of law. In the first instance, with respect to the issuance of the injunction itself, the District Court abused its discretion by not considering the First Amendment considerations that are present here. In addition, and a related issue, the District Court did not analyze the public interest in this program, the Kiss Lost Concert DVD, being distributed. This is a band that in its infancy, in 1976, gave a concert, the Roosevelt Concert, that was heretofore unpublished and undistributed and unavailable to its fans. There is a great amount of interest in this footage, as is evident in the record attached to Mr. Mallon's declaration, the various comments on Amazon.com, that the fans of this band were extremely interested in this footage being available for the first time to them. And unfortunately, the District Court did not give any credence to that public interest prong of the preliminary injunction issue. With respect to the merits, the biggest problem here by far is that the District Court completely failed to analyze the nominative fair use defense that this Court has established, starting from New Kids on the Block all the way through Cairns v. Franklin Mitt, Wells v. Playboy, et cetera. Indeed, the problem with the Court adopting wholesale the plaintiff's findings of fact and conclusions of law is particularly underscored by the fact that the only discussion in the conclusions of law with respect to the nominative fair use defense is 180 degrees incorrect. It is the exact opposite of the law. In the District Court's conclusions of law that were, again, adopted from the plaintiffs, it states that because defendant's use of the mark kiss was in its secondary trademark sense, the nominative fair use defense does not apply and goes on to cite Brother Records v. Jardine. That is exactly opposite of the holding in Brother and all the other Ninth Circuit cases regarding this. In fact, when it is a secondary trademark use of the mark, that is when the nominative fair use defense does apply and does kick in. So the District Court erred on a very important point of law. Not only did it establish the law incorrectly, but then it failed to analyze anything with respect to the three-prong test that the nominative fair use defense involves. The three prongs established in New Kids on the Block were, one, is it necessary to use the mark to identify the product? There's no question here that in order to identify a DVD about the kiss band, we would have to use the word kiss in the title. And that is, in fact, what we did. The second prong of the test. You have to use the font lettering. We did not use the font lettering, Your Honor. And in any event, the plaintiffs waived that argument. It's something pretty close. I mean, it's not Times New Roman. It is not Times New Roman, Your Honor. But, first, the plaintiffs waived that argument by never bringing it up before the District Court. We saw that for the first time on appeal. It's obviously very difficult for us to now try and debate a factual point in front of this Court. But, second, we don't believe that it is substantially similar, not that that's a trademark test. I'm adopting those words, obviously. It is not identical, certainly, and it is not substantially similar. But if it is, under your basic theory, does it matter? Aren't you free to use that to identify the group, if that's what identifies what the product you're selling? Well, under the nonlimited fair use defense, Your Honor, if, in fact, we used more of the mark than was necessary to identify the product, it is conceivable that that second element would be found against us. Well, how is it, if you're trying to say that it is a particular group and identify the group which is known by the trademark, whereas the word kiss otherwise just has other meanings, but if that's what identifies which group you're recording or who's presenting, I mean, just if it were Prince that you were presenting instead of kiss and you used the symbol that identifies Prince, you know, I'm not sure why it matters. Well, we agree with you, Your Honor. I mean, if you're right on your basic theory about this, I don't know why it matters. The concern I have is what you started with. You know, is this really a copyright case, not a trademark case? And if so, are you allowed to use trademark law rather than copyright law in this circumstance? If you're right on that, that it's really a copyright action that has to be brought, then it really doesn't matter, does it? Well, that is certainly our position, Your Honor, that we obviously have been forced to defend on the trademark basis because that's the point. Couldn't you have a violation of both? I mean, what is it that, just because there's a copyright or potential copyright violation, what is it that says there can't be a trademark violation? There's nothing that says that intrinsically, Your Honor, but under DASTAR, for example, regardless of the copyright status of it, this is not a source identifying use to begin with. I should have probably prefaced even the nominative fair use discussion with the fact that if DASTAR applies, and we think it does, the origin of the goods here is with Passport. It is not with KISS, the communicator of the idea. So in the first instance, it's our position this isn't even a trademark use. The second point, more to Your Honor's question, under Comedy 3, there can be both, but the trademark discussion that is being, that was put forth, the trademark argument that was put forth by the plaintiff was that the facial paint and the appearance of that And Comedy 3 says that you can't in that instance have both, that one really is preempted by the other, that the copyright in the performances, in the actual performances themselves would preempt any discussion of being, you know, a trademark infringement in addition to that. But there certainly could be. Had DASTAR been decided by the time the district court ruled? I was looking for a citation to DASTAR, Mr. Kutuzov. I believe so. I have it decided by the Supreme Court on April 2nd, 2003. And I believe June 2nd, 2003. It's argued in April. I'm sorry. You're right, Your Honor. Of course. June 2nd and the December. December. So DASTAR was in fact argued to the district court and the district court did not accept our argument with respect to DASTAR. Those are the two preliminary reasons why it's not even really a trademark question. Even say much about it, if anything. I'm sorry, Your Honor. Or even say much about it, if anything. I don't believe the district court addressed DASTAR in its findings. In fact, in conclusions of law, Your Honor, I may be mistaken, but it certainly did not discuss it at any length. But getting back to the nomenclature of fair use, the second element, as Your Honor pointed out, is the issue of how much did we use. And we would agree that it is not unreasonable to evoke the correct identity of the font. We don't believe that we did. We don't think we crossed any line. But if we had done, we believe that it would be permissible to identify the band. Then the third part. Why couldn't you use a block lettering? And why do you have to put a picture of the band on the – I mean, you could say the band called Kiss on the cover and nobody would be confused. Well, especially in conjunction with a picture of the band. That would be correct, Your Honor. I don't know. Leave out the picture. Well, that – I mean, you could have a hundred kids out there, you know, whoever it is that listens to this, and say, you know, this is the lost concert of the band by the name of Kiss. It wouldn't be terribly, you know, artistic or anything. But is there any doubt that it would identify exactly who – that this wasn't, you know, something about kissing or – It's unlikely that it would have been. You could make it very clear what this was about without using either the jagged lettering or without actually putting the faces of the band members on the cover. Well, there's nothing – you may be right, Your Honor. There's nothing in the record with respect to that. And since the district court did not even address the three-prong test in the denominator of fair use defense, we don't know how the district court would have found on that point because there was no discussion of it. But I would submit since we clearly – You say it's waived? You say they did not raise the lettering in the district court? That is correct. The plaintiff's argument with respect to the logo itself, the font, has been waived because it was not raised in the district court. And they did raise the argument as to the picture? No. Either the picture or the font? There was no argument in front of the district court regarding that. There was an argument with respect to the facial paint, and perhaps that's what you're referring to, because the picture itself, the only trademark even conceivable depicted in the picture is the facial paint that, of course, is inseparable from the performance and from the picture of the band because they performed in the facial paint. So any band – any picture of the band Kiss is by virtue of how they performed. So you could have removed the facial paint by removing the picture? That is correct, Your Honor. We could have done so. You could have done that. And the second prong of the test you're urging is one that says uses only as much of the trademarks as necessary to inform the consumer what's inside. That is correct, Your Honor. And your brief makes the point that Passport does not use the Kiss logo design. So you're raising a question in your own brief as to what the box looks like and how the word Kiss appears on the box. And that suggests to me that we do have in front of us an issue with regard to what typeface is used and an issue with regard to whether the painted faces appear on the box or not. Because if all you're trying to do is to say this is a video of the band called Kiss, you can do that without having a logo that's at least somewhat resemblant to what the band has trademarked and without using the painted faces. Well, we don't know that here, Your Honor, because it wasn't analyzed at all by the district court. That's actually more to our argument than any question of waiver, is that the district court simply dismissed, incorrectly as it turns out, dismissed the Nominee to Fair Use defense in its entirety. You will not find any discussion of either of the briefs. And the district court didn't just ban your use of those things on the cover. They banned distribution of the album or the tape, whatever it is, regardless of what was on there. Well, that's correct, Your Honor. And that's actually related to our First Amendment argument, that this went further, this injunction went further than necessary, given the fact that we're going to question the First Amendment. If the violation is that you say, you know, they used their paint on the cover, painted face on the cover of the album or the tape, if that's the violation, the remedy would be don't use that. You can't distribute anything that uses that. It wouldn't be you can't sell the performance. We agree with that statement, Your Honor. We believe the reason I brought up the First Amendment is because there is case law that's saying in a First Amendment situation, one of the ways to enjoin a product would be to make sure, for example, there were disclaimers which we had on our product or, as you're pointing out, perhaps a more narrowly tailored injunction. Again, much like the findings in fact at conclusions of law, the preliminary injunction order was essentially just adopted from what the plaintiffs put in front of the court, which was a blanket injunction against the distribution of the DVD, regardless. Even if you had done what Judge Kuczynski said? That is correct. Even if you had said a band named Kiss, and even if that made people think that's the real legitimate Kiss, you wouldn't be allowed under the injunction to do that. That is correct, Your Honor. That's our view, is that it was overbroad in that respect as well. We were basically enjoined from distributing the DVD or using any of the marks of Kiss, et cetera. So they established in their position that the word Kiss is a trademark. So we could not have even used nominatively, even if the second element had been completely in our favor. By deletion of the facial paint and no use of the logo, we would have still been enjoined from distributing this DVD. But the third factor is, did we need to? Even if you change all of those things. That's correct. That is right, Your Honor. You could call it guess what, but then guess genes will go after you. Undoubtedly. We're the guess who. Yes. Then you'd have two problems. Even if the second prong had been decided against us, which it wasn't, not to beat a dead horse, there was no discussion of it, we won two of the three. And the third factor is, did we mislead the public by our use of the nominative mark, nominative fair use of the mark? And here, that is – it is impossible to find that when we put a disclaimer on the front. We clearly were not intending to trade and make people think. Tell me about the timing of the disclaimer. The disclaimer came in later, right? The disclaimer was on the packaging from the get-go, Your Honor. It did not appear on the website until after. The packaging that I think the Plaintiff's Counsel got prior to the litigation being filed did not yet have the disclaimer on it. I'm not sure about that. But certainly by the time of the injunction, I believe both of the packaging and the website, our website distributing the product, had the disclaimer on the front of – well, it was on the front of the package and it was on the website itself. And that was in place. And we believe that the disclaimer alone – see, to the extent – because when the nominative fair use defense applies, all the cases make clear that Sleetcraft is irrelevant. You don't use the Sleetcraft test if nominative fair use defense applies. But here, even if we apply Sleetcraft and went to likelihood of confusion, there really isn't any. There's no evidence whatsoever in the record. The only evidence is somebody saying this is not authorized by the band. We do have the disclaimer, which unlike Toho, was on the front of the packaging, not on the back. And even the court in Toho acknowledged that if it had been on the front, that might have been sufficient to negate confusion. We have a good faith situation here. We did license the footage. We didn't just bootleg it and run out and sell this footage without permission. We got a license for it. So with the – Do you have any reason to believe the party you got the license from has the rights? They represented that they do to us, Your Honor. And there's correspondence attached to the declaration of Mr. Malin in support of the We own the copyright in this motion picture footage, and that's what they licensed to us. Very quickly, the dilution arguments also fail because they're not trademark uses. Also, under dilution, they have to show proof of dilution. Under Mosley, there's no proof in the record. It just concludes restatements. The rights publicity claims here are clearly either not – they're accepted under the statute, 3444 section D, as public affairs, which is a very broad definition under California law, or they are preempted. I'm going to remain – I'm going to hold the rest of my time. Thank you, Your Honor. Thank you. I'm Gary Malin. I represent the plaintiff, Santa Pelley. And the issue here is whether the district court abused its discretion in granting an injunction prohibiting the distribution of this work where there was really no dispute in the record that passports grantor did not even have. Why – before we get to the nitty-gritty of this, why is this a First Amendment injunction that is subject – you know, almost never granted? I mean, you're trying to enjoin the distribution of a First Amendment expression, and we almost never grant injunctions in First Amendment cases. It's a stain of speech. Well, this is a commercial product, and that's what this is. That's what this is. And the courts will frequently – So what? There's nothing particularly newsworthy about this. It's not a – It doesn't have to be. It's not a – it's not a – It doesn't have to be. First Amendment is very broad. It covers – it covers all manner of speech, important as well as unimportant. The inquiry is lover. This isn't any type of documentary. It's a – it's a recorded performance of this. I know what it is. It's of historical value. It's of interest. But it's clearly a First Amendment expression. For example, Kiss concept couldn't very well be enjoined, you know, because they use bad language, let's say. Let's say next time Kiss performs, the municipality says we're going to deny a permit for them because – I have no idea how Kiss performs. I've never seen one myself. But let's say it's one of those bands that uses bad language in its – in its songs. Could the municipality say we're going to deny a license because we think that they use bad language and that we think this is inappropriate? Could they do that? I don't think so, but I don't think that's – Well, why not? It's a commercial – it's a commercial transaction. It's a commercial thing, right? But it's different than a third party trading on the intellectual property of this group and exploiting it for profit. I'm sorry. So you agree with me that the band's performance itself is subject to First Amendment protections in terms of licensings, in terms of getting an injunction, anything like that? I'm not. There's – the First Amendment doesn't – doesn't preempt the band's intellectual property rights. You know, I think you're confused as to the Copyright Act has a special provision dealing with injunctions. And copyright injunctions are quite common because the Copyright Act has a specific provision that says injunctions shall be issued on a showing of likely infringement. It is a departure from normal First Amendment standards that's authorized by Congress. But we don't have a Copyright Act claim. Well, here, there's no Copyright Act claim. So we are in the general area of expression, which presumptively First Amendment protected. And I just don't understand. I don't remember the last time I've seen a First Amendment injunction. To the extent that this is anything, and I think that Passport – excuse me, that Metropolitan, which is Passport's grantor – Metropolitan, which is Passport's grantor, has been consistent in all of the letters that it's written and its public pronouncements that it does not have the rights to commercially exploit this product without the consent of KISS. At best, then, it would have had, at best, a limited license to film it but not to commercially exploit it. Let's say they have no rights at all. Let's say they stole it. I mean, let's say, for example, you steal a story and then you're going to publish it in the new – in the National Enquirer. Can the author get an injunction and say, I want to enjoin publication of the National Enquirer because they stole my story? No way. No way. No way. Congress actually enacted a statute, so Section 1101, 17 U.S.C. 1101, to deal with a situation where you have a bootleg of a live performance. And it really affords – you don't have a claim for infringement under Section  Is that a claim you're raising here? It's not a claim that we raised initially below. But under Section 1101d, it specifically says that the rights that are afforded to us are not exclusive. It doesn't prohibit us from raising other rights, such as the trademark rights or the right of publicity rights. But Section – And that right provides for an injunction? Excuse me, 1101? Provides. Yes. 1101 – 1101 – What does it say? This is in the Lanham Act, but I don't understand. No. This is 17 U.S.C. Section 1101. This is part of the Lanham Act. You're not – you're not proceeding under that section. And you say you could get an injunction under that section, you could get an injunction under copyright, but you're not proceeding under either of them. But all of the claims that we have raised do give us the right to injunctive relief, and Section 1101d specifically says that it is not an exclusive remedy. It was enacted by Congress to – to deal with a situation where we could have raised a claim under 1101. It deals with a situation where there's unauthorized reproduction or distribution of a bootleg. In other words, it gives quasi-copyright protection. A bootleg is a copyright claim, isn't it? It's not a trademark claim. What? Under Section 1101. Let me – you know, I'm not trying to give you a hard time, but this strikes me as a commercial dispute. You have a dispute about – about right to publicity, you know, sort of like Vanna White. You've got a dispute about – about trademark. But you don't have any copyright dispute. Normally, the way the disputes are resolved is you go to trial, you prove damages, and if they're wrong, they pay you money. Now, what is so special about this noncopyright claim that it – it authorizes the thing that we never do in America, which is to take things that are speech and enjoin them? I mean, what is so special about this case? Well, the – the – again, under – under Section 1101, that – that is a statute that does allow the Court to grant injunctive release. You know, all you've said – all you've told me is it's not an exclusive remedy, but you still haven't told me what 1101 says. Section 1101 prohibits anyone without the consent of the performer from fixing the sounds or sounds and images of a live musical performance in a copy or phono record or reproducing such copies or transmitting or otherwise communicating to the public the sounds or images of the live music performing – performance for distributing, offering to distribute, selling, offering to sell, et cetera, et cetera, the – the performance as – as affixed. Okay. So – so that section, which you're not relying on in your case, prohibits certain things. It certainly is a section that we could have raised, but again – But you didn't. I mean, you know, it – you could – I don't understand why this case is coming up this way. Why – if that's what they're violating, why didn't you proceed it? But it's not the only right they're violating. What – what – clearly, what was before the Court – Had you – had you raised that section, what tells you you don't have the injunction under that section? It's prohibited, and if you prohibit it and you violate it, you might, in fact, have to pay damages. What does it say? You can go to court and stop speech. But copyright is different. Copyright has a specific provision in the Copyright Act dealing with injunctions. Some of us have wondered whether Congress can or ought to do that to over – try to restrain the First Amendment in the Copyright Act, but that's the law. That's the way the law is developed. But under the statutes that we have raised, under the trademark infringement statute, under the Lanham Act statute, under the right of publicity statute, we clearly do have the right to seek injunctive relief, given the fact that the use of the marks and the use of Mr. Simmons's and Mr. Stanley's images. You have the right to seek injunctive relief to try to enjoin the New York Times from publishing war secrets, too. In the sense you can go to court and you can also be told no. The question is, what is it – I mean, what you come here is defending injunctions that was granted, as best I can tell, on the normal balancing of the hardships, likelihood of success ground. But this is speech. Why didn't the district court fundamentally err by applying normal injunction standards to the – to this prayer for relief, rather than saying we're dealing with First Amendment speech, it's not copyright, so the special rules applicable to copyright don't apply, and we never enjoined speech. The last time we enjoined speech was when this publication, Oregon, wanted to publish the formal for making an atom bomb. We didn't enjoin speech when they had war secrets in the – in the – in the New York Times. This is – what the Court enjoined was the unauthorized distribution of this video, which embodied the unlicensed trademark and publicity rights of the plaintiffs. Rights that we've established in the record are – this is probably the most trademarked, excuse me, the most merchandised performer in the history of rock music. This is a trademark that these plaintiffs have spent a lot of money to zealously police, guard, enforce, and what the plaintiffs were doing was – was trading on this to basically profit from a commercial product. Now, you're not talking now about the cover. You're talking about the actual performance. I'm – that and yes about the cover. Well, the cover is easily remedied. I mean, all the injunction has to do is say you can't use it on the cover. But that's not what you're really interested in. I'm trying to stop the distribution of this disc. The cover, the promotional material that came with it, the promotional material on their website. But that can all be changed. The injunction, as you saw it, was to prevent the distribution of the disc and the showing of the performance. Which also embodies the trademarks and publicity rights of the plaintiffs. So it's – and if it were not – if they didn't paint their faces, if it were another band, another performer, there'd be no trademark violation? There would still be a potential right of publicity violation. But yes, there wouldn't be – there wouldn't be that type of trademark violation. This is – this is a unique situation, but it's not just that this band paints its face. This is the – this is how this band is identified. There's – each of the four members has a specific character. And these – these face paints are these characters, and the clothes and the paint have been trademarked. And didn't – didn't the Supreme Court tell us in Daystar you can't use trademark to get around copyright law? And in Cromley 3, we said the same thing. Daystar relates to a right of attribution claim. That's all Daystar was. Daystar was a situation – the cases that followed Daystar involved a situation where the plaintiff was claiming a lack of attribution. Here, that's not what we're alleging. We're alleging that, in fact, they used the marks and they traded on the marks to identify the product and create a false endorsement. So I think that Daystar is limited on its face to a claim – and Daystar specifically talks about reverse palming off. And we have not alleged a claim for reverse palming off. The – the Comedy 3 case is also distinguishable. Comedy 3 is a situation where there was a motion picture, and they had 30 seconds of a clip of the three Stooges playing on a television set in the background of whatever scene was being portrayed in the motion picture. The three Stooges were never mentioned by name. They weren't used in the title. They weren't used to market the product. They were just in the background. And that was the distinguishing factor. Here, what the plaintiff is doing is using the distinctive marks – the logo, the face paint, the characters – to actually profit – profit and identify themselves with Kiss and – and profit from this commercial product. So I think that Comedy 3 is quite distinguishable, as is Daystar. What do you do with new kids? What do you do with non-meta views? They – we clearly have a series of cases after new kids saying that if you take – you can take as much as you must take. And putting aside the cover, as Judge Reinhart says, there's really no way to give any less than – there's no way to giving – you know, since you're – since what you're presenting is the performance, there's no way to present any less than the – than they did. Well, the – the nominative fair use argument simply says you can't utilize more of the marks than necessary to describe the work and you can't suggest sponsorship. And the instances where the nominative fair use defense has been applied, and I'm thinking in particular of the Jardine case, the Brothers Records case, which is cited by Appellant, is a situation where they said it was okay for Mr. Jardine, a former member of the Beach Boys, to go out and bill himself as a former member of the Beach Boys or formerly of the Beach Boys, but he couldn't use the Beach Boys mark in a way to cause confusion with the public. And here that's exactly what the plaintiff has done. And I also would say – Well, it's not – it's not the confusion. This is a kids' concert. There's no question. Right. In that case, it wasn't really the Beach Boys. And you would mislead the public into thinking it was the Beach Boys. Here, the more you identify it's – that it's really Kiss, not some phony Kiss, you're – you're telling the public the truth. This is the Kiss band. It's not just a bunch of other guys who dressed up as Kiss and moused – moused the lyrics. It's true. You also have the situation – In fact, you know, you might then – if they just used the regular Kiss instead of the symbol, people could say, well, no, we didn't pretend we were that Kiss, the ones with the symbols. Well, you also have the situation of the Playboy case that specifically talks about when you use the font that that's not a fair use because you're going beyond simply using the mark as an identifying factor, but you're using it as a – You get back to the cover. Just put the cover aside. Let's not even talk about the cover. Let's talk just about the performance. There's nothing they can do about the performance. A performance is a performance. You're not saying they should have gone in and changed their faces, are you? Sort of digitally gone in and made them look different? No, of course not. And that's a fundamental problem I believe that the defendant has in that ultimately they could have acquired – Somebody has that fundamental problem. There's no doubt about that. The defendant could acquire no greater rights than its grantor had to grant. And we have – That wasn't the cause of action that we're dealing with here. This isn't a copyright claim. This isn't a claim with regard to the rights to the concert. This is a claim of trademark. And there has been no grant of rights by my clients who have controlled and traded on these trademarks and their publicity rights for many years. There has been no grant of rights by them to anyone. What you have – Suppose it's a plain white box that says in Times New Roman a factual description of what's inside the box. Is it your allegation that – Or let's focus on the portion of the injunction that speaks of removing from their premises any portion of the footage from the lost concert performance. How is that sustained by a trademark claim? What trademark is involved in the footage from the concert? Well, again, the bands – And this is a unique situation where you have the characters which are – This is a trademarked item. And, in fact, it is not just the performance of the band, but, in fact, the band's actual visual image, the trademarked characters that are being exploited as part of this video. And that's what would constitute the separate – Putting apart what's on the cover and in the promotional materials would constitute the trademark violation that this is not just because of who this band is and how they market themselves. This isn't just a bunch of songs on a video. You actually have characters that are being performed, and those characters are trademarked. And those uses are unlicensed. And with that, unless you have any more questions, I'll submit. Thank you very much, counsel. Very briefly, the bootleg section doesn't apply here because on its terms it doesn't apply to conduct prior to 1994. So it's a big question whether that bootleg section even applies. But the bootleg statute's not involved. Exactly. I understand. But to the extent it's even come up, it would not apply in our situation. But, moreover, and I think this is extremely relevant to several of the trademark arguments with respect to our good faith, there is no dispute in the record about who owned this copyright. Metropolitan says several times in the record at 150, at 151, and there are other places as well, where they say we own the copyright in this footage and we are licensing this copyright to you. And so there is no dispute. They also say that you're going to have to go out and get some more licenses. That was their position, Your Honor, but it's our position here today that we did not need those licenses to distribute this product. We say there's no dispute in the record in such a way that suggests that there can't be an issue over here. There sure can be issues over there. That's not this case. Indeed, Your Honor. I did not mean to apply that. But to the extent, I believe, his opening, Mr. Mallon's opening statement was there's no dispute in the record that the grantor did not have the rights. They certainly claim to have had the right to give us the copyright. And to the extent the standard is clear and convincing evidence that they would likely succeed on the merits, I don't think the district court properly applied that standard. Finally, with respect to Daystar, it is absolutely not as narrow as the plaintiff would have you say. Basically, in Daystar, they specifically found that in our situation, where there is an underlying communicative product, like a book or a video, that the argument that that's special somehow just doesn't fly. They say the problem with this argument, according to special treatment to communicative products, is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically. Also, Comedy 3 is very specific about why the face paint in the actual copyrighted performance footage cannot be the basis of a Lanham Act claim. There, they were asserting that the name, the characters, the likeness, and the overall act of the Three Stooges was a trademark. And the court found, essentially, Comedy 3 is arguing that the Clippett issue falls under the protection of the Lanham Act because it contains elements that, in other contexts, might serve as trademarks. Had New Line used the likeness of the Three Stooges on T-shirts, which it was selling, Comedy 3 might have an arguable claim for trademark violation. But we will not entertain this expedition of trademark protection squarely into the dominion of copyright law to allow the Lanham Act coverage of a piece of footage taken directly from the film by the Three Stooges. There's no question here that the district court abused its discretion in not properly analyzing the First Amendment issues and not properly analyzing the core trademark question, which was an omnipotent fair use. Thank you, counsel. Thank you. The case just argued will be submitted. The final case for oral argument is United States v. Wilkins. Thank you.
judges: Reinhardt, Kozinski, Clifton